**LITTLER MENDELSON, P.C.**
Ivan R. Novich (N.J. Bar No. 038311996)
Rachel Simone Frey (N.J. Bar No.
217592017) One Newark Center, 8th Floor
Newark, New Jersey 07102
P: (973) 848-4700
E: inovich@littler.com
E: rfrey@littler.com
*Attorneys for Defendant*
*Wayfair LLC*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| DARRYL GAINES,<br><br>Plaintiff,<br><br>v.<br><br>WAYFAIR, LLC and JOHN DOES 1-5 AND<br>6-10,<br><br>Defendant. | Civil Action No. 1:21-cv-15843-KMW-EAP<br><br>**DECLARATION OF RACHEL SIMONE FREY, ESQ. IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**<br><br>*Via ECF* |

**RACHEL SIMONE FREY, ESQ.** declares as follows:

1. I am an attorney-at-law of the State of New Jersey with the law firm of Littler Mendelson, P.C., attorneys for Defendant Wayfair LLC (improperly pled as "Wayfair, LLC") ("Defendant") in the above-captioned action. I make this Declaration in support of Defendant's Motion for Summary Judgment dismissing the entire Complaint of Plaintiff Darryl Gaines ("Plaintiff") with prejudice. This Declaration is based upon my personal knowledge.

2. Collectively attached as **Exhibit A** are true and accurate copies of the relevant pages from the transcript of Plaintiff's deposition, conducted on January 5, 2023. Plaintiff's deposition transcript is cited as "Gaines Dep." in Defendant's Brief in Support of Its Motion for Summary Judgement.

3. Attached as **Exhibit B** is a true and accurate copy of a personnel document reflecting the date Plaintiff signed Wayfair's Employee Guide and Harassment Policy acknowledgement, produced in discovery and authenticated by Plaintiff at his deposition as P-4. (Gaines Dep., 32:24-34:3).

4. Attached as **Exhibit C** is a true and accurate copy of Wayfair's "Symptoms Awareness and Symptomatic Policy" poster, produced in discovery and authenticated by Plaintiff at his deposition as P-11. (Gaines Dep., 46:2-15).

5. Attached as **Exhibit D** is a true and accurate copy of Wayfair's "Keep Well This Winter" poster, produced in discovery and authenticated by Plaintiff at his deposition as P-7. (Gaines Dep., 38:20-39:15).

6. Attached as **Exhibit E** is a true and accurate copy of another version of Wayfair's "Keep Well This Winter" poster, produced in discovery and authenticated by Plaintiff at his deposition as P-8. (Gaines Dep., 40:1-14).

7. Attached as **Exhibit F** is a true and accurate copy of Wayfair's "Stop!" poster, produced in discovery and authenticated by Plaintiff at his deposition as P-9. (Gaines Dep., 40:15-41:9).

8. Attached as **Exhibit G** is a true and accurate copy of an email dated April 2, 2021, from Plaintiff to Talent Management and Nick Segura, produced in discovery and authenticated by Plaintiff at his deposition as P-21. (Gaines Dep., 88:19-89:1).

9. Attached as **Exhibit H** is a true and accurate copy of the Termination Report for Gaines, dated April 7, 2021, produced in discovery and authenticated by Plaintiff at his deposition as P-24. (Gaines Dep., 94:25-95:11).

10. Attached as **Exhibit I** is a true and accurate copy of the warehouse associate job description, produced in discovery and authenticated by Plaintiff at his deposition as P-3. (Gaines Dep., 29:16-14).

11. Attached as **Exhibit J** is a true and accurate copy of Plaintiff's positive COVID-19 test result, produced in discovery and authenticated by Plaintiff at his deposition as P-18. (Gaines Dep., 85:6-22).

In accordance with 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the above is true and correct.

Dated: March 8, 2024

*/s/Rachel Simone Frey*
Rachel Simone Frey, Esq.

# EXHIBIT A

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

---

DARRYL GAINES,

Plaintiff,

-v-

WAYFAIR, LLC, and JOHN DOES 1-5 and 6-10,

Defendants.

Civil Action No. 1:21-cv-15843 NLH-AMD

VIDEOCONFERENCE DEPOSITION UPON ORAL EXAMINATION OF DARRYL GAINES

---

T R A N S C R I P T of testimony taken remotely stenographically by and before MARGARET VOLLMUTH-CORSON, a Certified Court Reporter of the State of New Jersey, via VERITEXT VIRTUAL VIDEOCONFERENCE, witness appearing from Mount Holly, New Jersey, on Thursday, January 5, 2023, commencing at approximately 10:03 a.m.

Job No. NJ5642774

Page 26

A. Oh, man. I applied approximately September/October, around those months. Like almost immediately.
Q. Do you know what year that was?
A. 2020.
Q. 2020. Okay. And how long after you applied did you hear back?
A. I heard back a day later.
Q. Okay. And what was that process like? Did you have to interview?
A. Yeah, I had a small cell phone interview, just talking about work experiences, and then I got an email like the follow -- within the week.
Q. Okay.
A. And that was really it.
Q. Do you remember who interviewed you?
A. No, I do not.
Q. Was it an in-person interview or remote?
A. It was remote.
Q. Remote? Okay.
All right. I'm going to show you what is going to be marked as P-2.
(Exhibit P-2, November 6, 2020,

Page 27

Wayfair letter to Darryl Gaines Bates stamped D-000029 to 31, is marked for identification.)
Q. Can you take a minute to read this? And let me know when you want me to scroll.
A. You can scroll. You can continue. Okay. Okay. Okay. Okay. Okay. Okay.
Q. Do you recognize this?
A. I believe this was like our -- our opening welcome packet.
Q. Okay. So like your offer letter?
A. Yes.
Q. Okay. And is that accurate that you received it on November 6, 2020?
A. Yes. Yes, it is.
Q. Okay.
A. That was around that time.
Q. Okay. And did you start employment on November 9, 2020?
A. I believe I had, yes.
Q. And I'm going to stop sharing this.
Did you start as a temp?
A. No. I started full-time, which was, you know, the 80 hours.
Q. Okay. I mean, were you -- so was it a seasonal position, like a temporary seasonal

Page 28

position though?
A. It started as, yes. So yes, --
Q. Okay.
A. -- it started off as that, then it transitioned.
Q. Okay. And what were your job duties when you first started?
A. Quality control.
Q. And what does that entail?
A. All right. Well, quality control you would get a random product, and then you inspect that product to make sure that there's no obvious damages, cracks, deformities, you know, just damage. You know, looking at the product before you, you know, give it to a customer. You're basically checking to see if, you know, it's broken or not.
Q. Okay. And what did your -- what was your shift?
A. It depends on the week. So a short week was from Sunday through Tuesday, and then a long week was Sunday through Wednesday.
Q. Okay. And when did the shift start, and when did it end?
A. In the morning it started, if I recall, 6 a.m. in the morning to about 4, 4:30 p.m.

Page 29

Q. Okay. And who was your supervisor?
A. His name was Nick.
Q. Do you know his last name?
A. I do not recall.
Q. All right. I'm going to share what's going to be marked as P-3.
MS. MATCHETT: And Rachel, just for the record, I have the first exhibit was Bates stamped D125 to 126, and the offer letter for P-2 is D29 to 31. I just like to put that on the record because it's helpful when we --
MS. FREY: Sure. Yeah. So the first exhibit was D125 to 126, the second exhibit was D29 to D31, and this exhibit, P-3, is D168, which I will share now.
(Exhibit P-3, Job description for Warehouse Associate Bates stamped D-000168, is marked for identification.)
Q. Okay. Can you take a minute to read this?
A. Yes. Okay. Okay. Okay.
Q. All right. And this is a job description for warehouse associate position. Did you do any of these things that are listed on this job description?

Page 30

A. Can you scroll a little bit down, please?
Q. Yes.
A. Thank you.
I did use scan technology to document the pertinent carton level information, including condition and quantity is kind of what I've done.
Q. Okay.
A. And I think that fits with QC, which is quality control.
Q. Okay. So for quality control you did some of them, but not necessarily everything listed --
A. Right.
Q. -- in the warehouse position?
Okay. How many people were on the quality -- with you on quality control?
A. Honestly, about five people, give or take.
Q. Was that all on your -- the same shift, or did they have different shift schedules?
A. They do have different shift schedules, but on that same shift there's about five that I know of.
Q. Okay. So there's five on your shift,

Page 31

but there might have been more that weren't on your shift that you didn't know about?
A. Yes. Yes.
Q. Okay. And was Nick Segura their supervisor as well?
A. Yes.
Q. Okay. Do you know who Nick's supervisor was?
A. No.
Q. Okay. And what was your relationship like with Nick Segura?
A. Honestly, he was cool. He was cool peoples. I know after a while, you know, we exchanged gamer information so we could play video games together after work. He was a cool person, you know, and then -- yeah, that's really it. He was a real -- a cool guy.
Q. Okay. Did you ever talk about work when you were playing video games?
A. No.
Q. Okay. And did you actually play video games with him after work?
A. Yes. Yes.
Q. Did you play video games with him after work after you were terminated?

Page 32

A. No.
Q. No? Okay. Why not?
A. Because the game of choice wasn't a game that I play normally, so after a while I just deleted the game.
Q. Got it. All right. Did you ever have any interactions with anyone from HR at Wayfair?
A. No, other than the email. That's it.
Q. Okay. Do you know/did you know someone called Madison Irons in HR?
A. Yes. Yes.
Q. And did you -- other than email and maybe phone calls, did you ever have any in-person interactions with her?
A. No. I mean, not me, no, besides a regular "Hi," "Good morning."
Q. Okay. And when you first came to Wayfair do you recall having to sign any employee handbook or any policies?
A. Not specifically. I know that I had to sign a paper, but...
Q. Okay.
A. Yeah.
Q. All right. I'm going to show you what I'm going to mark as P-4, and the Bates label is

Page 33

D20.
(Exhibit P-4, Table titled "Standard Documents" Bates stamped D-000020, is marked for identification.)
Q. Okay. Can you take a look at that and let me know when to scroll?
A. Okay. Okay.
Q. All right. So this says -- in the third line down it says Wayfair Employee Guide Link, and then it says that you acknowledged it. So do you recall acknowledging that employee guide?
A. I do not, no.
Q. Okay. And a little ways down it says Wayfair Harassment Policy, and it says that you acknowledged that as well. Do you recall acknowledging that?
A. No.
Q. Okay. And could it have been the kind of thing where you just don't remember, but you did read it?
A. All --
MS. MATCHETT: Objection. You can --
A. -- I can say, honestly --
MS. MATCHETT: -- answer.
You can answer.

A. Okay. With these document, like I don't know when or where I was at. All I know is that I just signed a bunch of paperwork.

Q. Okay. All right. I'm going to show you what I'm going to mark P-5. The Bates labels are D443 to D508.

(Exhibit P-5, Wayfair Employee Guide, Version date: January 2021 Bates stamped D-000443 through 508, is marked for identification.)

Q. All right. Hold on. I think it will be easier if I make it smaller. Okay. And I'm just going to scroll through this quickly and then go to the places that I want you to take a look at.

So looking at the title page, does the -- do you recognize the Wayfair Employee Guide?

A. Yes.

Q. Yes. Okay. All right. So I'm going to go to page 8.

So on page 8 where it says "Equal Employment Opportunity," do you recall ever reading this policy?

A. No.

Q. Okay. Is that -- did you just not read the handbook?

A. Honestly, I must have skimmed it just

to sign at the bottom.

Q. All right. What about Policy Against Sexual Harassment and Other Workplace Harassment; did you ever read that part?

A. No.

Q. Okay. And then how about Wayfair's reporting procedures for harassment and discrimination, the page Bates labeled D458; did you ever read that part?

A. No, but all I can say, honestly, at one point we had like, I guess, a course or a class about the -- the guidelines sexual harassment and the discrimination.

Q. Okay. And when did you have that course or class?

A. I do not recall the date, but it was within that year.

Q. Okay. And based on that class did you understand that Wayfair had a policy prohibiting discrimination and harassment?

A. Yes.

Q. And did you understand there was a reporting process if you felt you were discriminated or harassed?

A. Not that I recall.

Q. Okay. So if you were subject to discrimination or harassment what did you understand that you were supposed to do, if anything?

A. Contact HR.

Q. Okay.

A. Or advise your supervisor and contact HR.

Q. All right. I'm going to show you what I'm going to mark as P-6, and it's D642 to D654.

(Exhibit P-6, Wayfair Employee Guide: Fulfillment and HDO Addendum, Version date: March 2021 Bates stamped D000642 through 654, is marked for identification.)

Q. Can you take a look at that?

From the title page do you recognize this document?

A. No, I do not.

Q. All right. So I'm going to scroll down, and before I start asking, did you know that Wayfair had an attendance policy?

A. Yes.

Q. Okay. Did you ever look at the -- where the attendance policy was written?

A. I'm sorry. Repeat that?

Q. Did you ever like read the attendance

policy, or was it something that was told to you?

A. It was told.

Q. Okay. Do you know if you had access to this?

A. To the point system?

Q. Well, to this, the Wayfair Employee Guide.

A. I believe that we did have access to it. Everything was, honestly, verbal.

Q. Okay. And who was it that told you verbally?

A. Nick, our supervisor.

Q. Okay. And when did he tell you that?

A. In morning standup, I think the first day of work.

Q. Okay. And what was the attendance policy?

A. Well, I believe it was called the point system. If you -- say you missed a day of work, that's one point. If you get six points, you're terminated. If you show up to work and have to leave for whatever reason, that's a half a point. But if it's COVID related, there's no points involved, and you will be paid for that day.

Q. Okay. And what about if it's another

type of sickness, not COVID; do you know if that -- if you get points for that or not?
A. You'll still get a half a point.
Q. Okay. And were you aware of whether Wayfair had any COVID related policies?
A. No. All I know is that -- what my supervisor told me; that if you do feel that you have COVID or been exposed to it, you're allowed to leave work and get tested.
Q. Okay. And that supervisor was Nick?
A. Yes.
Q. When did he tell you that?
A. Around the same time, in the standup meeting on the first --
Q. Okay. Did --
A. -- day I was working.
Q. Were there ever any posters put up around the warehouse about COVID?
A. Yes.
Q. Okay. I'm going to show you what I'm marking as P-7. It's Bates labeled D516.
(Exhibit P-7, Copy of a "Keep Well This Winter" poster Bates stamped D000516, is marked for identification.)
Q. Can you just take a look at this?

A. Um-hum. Okay.
Q. Do you recognize this?
A. Yes. Yes, I do.
Q. Okay. And what is it?
A. It was the, I guess, COVID policy poster.
Q. Okay. So was this one of those posters that were around the warehouse?
A. Yes, but it did not look like that.
Q. Okay. What was the difference?
A. A different color, honestly, or -- it was roughly the same.
Q. Okay. So the same information, just different color?
A. Yeah.
Q. Okay. And do you see at the bottom where it says, "Do not come to work if you are sick"?
A. Correct.
Q. Okay. And did you ever read this poster while you were at work?
A. Yes.
Q. Okay. I'm going to show you what's marked as P -- I'm going to mark as P-8, and it's Bates labeled D517.

(Exhibit P-8, copy of a "Keep Well This Winter" poster Bates stamped D-000517, is marked for identification.)
Q. Okay. Can you take a minute to read this too?
A. Yes. Okay. Okay.
Q. Okay. And is this also one of the posters that was around the warehouse?
A. Yes.
Q. And is this one that you had seen?
A. Yes.
Q. Okay. Is it the same thing that it was a different color, or was it this color?
A. It was a different color.
Q. Okay. I'm going to show you what I'm going to mark as P-9. That's Bates labeled D525.
(Exhibit P-9, Copy of a "Stop!" poster Bates stamped D-000525, is marked for identification.)
Q. Okay. Can you take a look at this and read it? Tell me when to scroll.
A. Okay. Okay. Okay.
Q. And do you recognize this?
A. Yes, I do.
Q. Where do you recognize it from?

A. That was posted on the inside of the door of the exit doors.
Q. Okay. And did you ever read it while you were at Wayfair?
A. Yes.
Q. Okay. And from it did you understand that if you were feeling sick you were not supposed to enter the building?
A. Yes.
MS. MATCHETT: Objection. You could answer.
Q. Okay. And what did you understand you were supposed to do if you were feeling sick?
A. You're --
MS. MATCHETT: Objection. You can answer.
A. -- supposed to --
MS. MATCHETT: You could answer.
A. Okay. You're supposed to inform your supervisor.
Q. Okay. And what after that?
A. And after that go home, get tested if -- you know, if you feel like you have COVID, and then inform -- excuse me -- inform your supervisor and HR the results.

Page 42

Q. Okay. And when can you come back to work after doing that?
A. That varies. It depends on how long you're supposed to stay out and when HR tells you to.
Q. Okay. I'm going to show you what I'm going to mark as P-10, and it's Bates labeled D124.
(Exhibit P-10, Wayfair COVID-19 Policy Bates stamped D-000124, is marked for identification.)
Q. Okay. Can you take a minute to read this?
A. Yes. Okay. Okay. Okay.
Q. Do you recognize this?
A. No, I don't. I'm sorry.
Q. Okay. In the middle under "Policy" it says, "Common symptoms included, but are not limited to." Did you know that those were -- do you understand that those were common symptoms of COVID?
A. Yes and no.
Q. Okay. And why do you say no?
A. Because a lot of these symptoms are corresponding to any other illness. That's not just to COVID.
Q. Okay. And what are those symptoms?

Page 43

A. Cough, runny nose, and that's really it.
Q. So cough and runny nose, but everything else you would consider a COVID symptom?
A. Yes. More or less, yes. Especially the -- the loss of taste and smell.
Q. Okay. Did you ever see COVID symptoms listed anywhere at Wayfair?
A. No.
Q. Did you ever make an attempt to look at the policy to try and see like what symptoms they had listed?
A. No. All I could remember is that Nick was telling us vaguely, you know, if you have, you know, A to Z, this is what you're supposed to do.
Q. Okay. When was that?
A. Within, you know, the first week or so of me working there in the morning.
Q. Okay. And do you remember what the A to Z that he listed was?
A. No. Not specifically, no.
Q. Okay. Did you ever try and go online or to look up what COVID symptoms were?
A. No.
Q. Okay. What about did you ever hear on

Page 44

the news what they were?
A. Yes. Definitely the news. It's honestly the same symptoms that's been showed.
Q. Okay. And when you say "the same symptoms that's been showed," do you mean what was on that --
A. On the screen, yes.
Q. Sorry.
Sorry. I just had a call.
So what was on the screen in the last -- okay. And was that everything that was on the screen?
A. More or less, yes.
MS. MATCHETT: Objection. You can answer.
Q. I can pull up the screen too.
And when you say "more or less," what do you mean?
A. Meaning like half of those symptoms were not there then.
Q. And when you say "then," what do you mean?
A. Two years ago back in 2020.
Q. Okay. Which half of the symptoms weren't there back in 2020?

Page 45

A. I do not recall.
Q. Okay. Do you recall any of them that were there back in 2020?
A. Shortness of breath was a -- a tall sign. Also with, again, taste and smell. Once you have those two symptoms, then you most likely do have COVID.
Q. Okay. So I guess is it your opinion then if you just have congestion or a runny nose that you don't have COVID?
A. I'm sorry. Repeat that?
MS. MATCHETT: Objection. You can answer.
Q. So is it -- I guess is it your opinion then if you just have congestion or a runny nose that you don't have COVID?
MS. MATCHETT: Objection. You can answer.
A. No.
Q. No? Okay. So you might have COVID if you just have congestion or runny nose?
A. No. It's -- again, everyone is different, so you can have a cough and have COVID, or you can be fatigued and not have COVID, you know, so it's not -- these symptoms doesn't really

Page 46

determine if you have it or not.
Q. All right. And I'm going to show you what I'm marking as P-11. It's Bates labeled D121 to D123.
(Exhibit P-11, Three COVID-19 policy fliers Bates stamped D-000121 through 123, is marked for identification.)
Q. All right. Let me scroll up to the top. Can you just take a minute to read this?
A. Yes. Okay. Okay. Okay. Okay.
Q. Do you recognize that?
A. Yes.
Q. And where do you recognize it from?
A. Again, it's one of those posters that was plastered in the warehouse.
Q. Okay. And do you recall reading it while you were at the warehouse?
A. No.
Q. Okay. And why didn't you read it?
A. I'm sorry. Say that again? I did not?
Q. Why didn't you read it; yes.
A. I do not recall. I know it was there for sure. Like I -- I've read, you know, most things around the building, and also my supervisor

Page 47

just tells me this in the morning.
Q. Okay. So you knew basically what was on it because your supervisor told you?
A. Right.
Q. Okay. And that supervisor being Nick?
A. Yes. Every morning he says the same thing before -- during standup.
Q. Okay. And so I know you said that you spoke with your supervisor about the -- about the policies and stuff, so I'm going to show you what I'm marking as P-12.
(Exhibit P-12, Gaines, Dj Record of Discussion dated 11/10/2020 Bates stamped D-000025 and 26, is marked for identification.)
Q. Can you take a look at that and just tell me when to scroll?
A. Okay. Okay. Okay. Okay. Okay.
Q. Okay. And do you recall having this discussion with Nick Segura?
A. No.
Q. Okay. Is there anything -- I mean, you said you had discussions with him earlier when we were first talking.
A. Correct.
Q. Is there anything on this that you

Page 48

don't recall discussing?
MS. MATCHETT: Objection. You could answer.
A. Okay. Other than the point system, that's really it. That's all we really talked about.
Q. Okay. You talked about the point system?
A. Yes.
Q. Did you discuss adhering to Wayfair's COVID-19 procedures with Nick?
A. Other than early in the morning about, you know, what to do if you feel like you have COVID. That's really it.
Q. Okay. So you don't recall having a specific conversation, though, on November 11, 2020?
A. No. No.
Q. Okay. Was there ever a point where Nick sat down with you and went over all the policies?
A. On a personal level?
Q. Yes.
A. No. Again, standup in the morning he goes over, you know, COVID related issues, and then we had, you know, a discussion about "you know what

Page 49

to do if you do have it," and that's the only thing he told me, --
Q. Okay.
A. -- is what to do.
Q. Okay. And is it possible you just don't remember this conversation, or are you saying that it didn't happen?
A. I don't remember the conversation.
Q. Okay. Got it. All right.
So going back, briefly, to the previous -- to P-11, I know you said that you didn't read it. Was there anything stopping you from reading this poster?
A. No, other than it's lunchtime or break time.
Q. Okay. And what do you mean by that?
A. We didn't have that much time for break.
Q. Okay.
A. You get from, you know, one side of the building to the next side of the building. But I acknowledge that it was there, but I did not have time to sit down and read it because I didn't have time to eat.
Q. Where was the poster located?

Page 62

A. It wasn't -- it wasn't that bad, no.
Q. Okay. And so I guess when you say "it wasn't that bad," why wasn't it? Like what about it wasn't that bad?
A. It's hard to explain. It's like I know when it gets bad, the allergies, like I know exactly what it feels like, and I know that specifically at that time it wasn't as bad. My eyes wasn't -- like I could see, and my eyes was not itchy at all. Just, you know, a cough and a sniffle. That's all I had, you know, but I know exactly when it gets really bad and intense, I know the difference between that and then back in 2021.
Q. And what do you -- how do you know the difference between it? Like what do you mean by that?
A. I get allergies all the time since growing up, so I know, you know, what to expect. I know --
Q. Okay.
A. -- if it gets bad, when it gets bad, the feeling of it. This is what I get all the time.
Q. And what was different in -- or I guess was something different in 2021?
A. No.

Page 63

MS. MATCHETT: Objection. You could answer.
A. Okay. It was --
MS. MATCHETT: You could answer.
A. -- normal.
Okay. It was normal. It was a normal night or morning.
Q. Okay. And did you tell anyone at Wayfair that you had seasonal allergies?
A. No. It's allergies. I mean, I don't see the -- the meaning behind letting somebody know that it's allergies. I mean, if they asked me do you have allergies, I would, you know, honestly answer them, but it's something that I wouldn't tell everybody.
Q. Okay. And so do you understand that -- so your allergies cause a cough, right?
A. Yes.
Q. And I think you said itchy throat and a runny nose?
A. Um-hum.
Q. Is that right?
A. Yes.
Q. And do you understand that those are also symptoms of COVID?

Page 64

A. Yes, I do.
Q. Okay.
A. So is everything else.
Q. What do you mean, "so is everything else"?
A. Common cold, you know, having a headache that's because, you know, you didn't eat as much or drink as much. A normal headache could be symptom of COVID.
Q. Okay.
A. That's what I mean.
Q. Okay. All right. Let me find...
Have you ever taken any COVID tests before?
MS. MATCHETT: Objection. I guess for clarity do we want to narrow the time frame down? Or if that's the question, that's the question. I'll just object to it.
Q. I just want to know any time in your life. So before you were employed by Wayfair or after have you ever taken any COVID tests?
A. Not before, no.
Q. Not before? What about after?
A. Yes.
Q. Okay. How many times have you taken

Page 65

one after?
A. Once after.
Q. When was that?
A. I do not recall.
Q. How about like broadly, like do you remember the year?
A. Yes. '22, somewhere around there.
Q. Okay. And why did you take the COVID test?
A. I took -- I -- I took a test because, you know, after everything was, I guess, back to normal, when hanging out with friends, when you find out one of your friends got sick, and just in case, you know, I took the test.
Q. Okay. So it was you thought you might have been exposed to COVID, so you took the test?
A. Yeah. Yeah. Yes.
Q. Did you have any COVID symptoms?
A. No.
Q. Okay. And what was the result of the test?
A. I was fine.
Q. Okay.
A. Or negative.
Q. Negative. Okay. And is that the only

time after you were employed by Wayfair that you took a test?
A. Yes.
Q. Okay. What about while you were employed with Wayfair, did you ever take a COVID test?
A. Yes, I did.
Q. When was the first time?
A. The first time was I took a test March 30, 2021, I believe, and I got my results back on April 2.
Q. Do you recall taking a COVID test before that?
A. Before March?
Q. Yeah.
A. No, I do not recall.
Q. Okay. Let me show you what I'm going to mark P-15.
(Exhibit P-15, Copy of a cell phone screenshot of a result of a COVID-19 test taken on 3/7/2021 Bates stamped D-000037, is marked for identification.)
Q. Can you take a look at this?
A. Yes.
Q. Tell me when to scroll.

A. You can scroll. Continue. Continue.
Q. That's all.
MS. FREY: And this is D37, sorry, just for the record.
Q. So do you recall taking a COVID test on March 7, 2021?
A. No, I do not.
Q. Okay. Let me go to -- so I'm going to show you what I'm going to mark as P-16, and it's D38.
(Exhibit P-16, Two forwarded email messages from Darryl Gaines and Madison Irons dated March 7 and 8, 2021, Bates stamped D-000038, is marked for identification.)
Q. Just tell me when to scroll.
A. You could scroll.
Q. And this is an email from you dated March 7, 2021. Do you recognize this email?
A. Yes, I do.
Q. Okay. And do you recall sending this email?
A. Yes. Now, yes, I do.
Q. Okay. And so does this refresh your recollection of taking a COVID test around March 7?
A. Yes. Yes.

Q. Okay. Do you recall why you took that COVID test?
A. If I could remember correctly, I went to the doctor's, I had a stomach issue, and I had to take a COVID test, I believe, so I could even enter the -- the doctor's office. After I took my test I, you know, let Nick and HR know what was going on, and then I --
Q. Okay.
A. You know, after that I went back to work.
Q. Okay. What was the stomach issue?
A. That's when I found out I had Crohn's disease.
Q. Okay. So when you took the test did you think that you -- was it because you suspected you had COVID or just because you had to take it to get in, I guess, to the facility?
A. I had to take it.
Q. To get into the facility?
A. Yes. Yes.
Q. Okay. And so did you think the -- or I guess was it a stomach issue where you had nausea? Like what were your symptoms?
A. It was cramping pain.

Q. Okay. And when you went to the doctor what did you think it was?
A. I had no idea until I found out that I had Crohn's disease.
Q. Okay. Did you think you might have COVID?
A. No. Not at all.
Q. No? Okay. And did you let your supervisor know?
A. Yes.
Q. And do you recall what he said?
A. No, I do not.
Q. Okay. And do you recall if HR ever responded to you or --
A. No, I do not.
Q. Okay. Do you know, did you get any attendance points for this time?
A. I might have. Either half a point or it probably got dismissed with a doctor's note. I really do not recall.
Q. Okay. And when were you able to return to work after taking the test, do you remember?
A. I do not recall. I mean, I guess five days after said date, but again, I do not recall when I had to come back.

Page 70

Q. Okay. And why is it that you told HR that you took the test?
A. I guess just to cover my own self --
Q. Okay.
A. -- being out.
Q. Sorry. Go ahead. I didn't mean to cut you off.
A. That's okay. Just to cover my own bases. I know for a fact that with them once you take a test, again, let them know your results either way. You know, since it was negative, I just wanted to know when I come back, you know, what time. You know, that's all I, you know, emailed HR about.
Q. Okay. And was that -- did you understand that based on the Wayfair's policy?
A. I knew it based off what Nick told me.
Q. Okay. And that's -- when you say what Nick told you, you're talking about the like morning discussions?
A. Yes. Yes.
Q. Okay. Did Wayfair give you any like specific PTO to use for COVID related absences?
A. I cannot recall.
Q. Do you recall whether you got paid for

Page 71

the time that you took off to take the test?
A. Yes. So if you have to leave work for a COVID related issue you will get paid for that day or that week, depending if you worked that scheduled week. That's what I do know or remember.
Q. Okay. And you said that you took another COVID test, one other COVID test while you were at Wayfair. Do you recall when that was?
A. Yes. It was March 30 is when I left to take the test.
Q. Okay. And other than those two tests, did you take any other COVID tests while you were with Wayfair?
A. No, I don't believe I have.
Q. Okay. So before you took the test on 3/30, so did you -- were you feeling sick at all on 3/28/2021?
A. No.
Q. Okay.
A. Well, you said 28? Yes. I had something to eat, did not agree with my stomach. At that time Nick wasn't there, so I contacted another supervisor, informed him what was going on, and he said I could leave, and so I left.
Q. Okay. And what did you eat?

Page 72

A. A breakfast sandwich.
Q. Had you ever eaten that kind of breakfast sandwich before?
A. No.
Q. Do you remember what kind it was?
A. I don't know. It's something from 7-Eleven.
Q. Okay.
A. Something small and quick, you know.
Q. Okay. And how sick did -- like when you say your stomach felt bad, how sick did you feel?
A. It was cramping. I had -- I couldn't move. Crippling pain.
Q. Okay. And do you understand that nausea is a symptom of COVID?
A. Yes.
Q. Okay. And so I'm sorry, I might have missed this. Who did you say that you told that you were --
A. It was --
Q. -- having stomach pain?
A. Yes. It was the area supervisor. His name was Mo.
Q. Okay.

Page 73

A. I informed him.
Q. And do you remember what time of day that was?
A. What time?
Q. Yeah.
A. Approximately around 6, 6:30, 7:00.
Q. And that was in the morning?
A. Yes. Early in the morning.
Q. Okay. What did he say?
A. That I could recall, he said that Nick told him about my Crohn's, and I'm sorry, and he was like, yeah, you can go home.
Q. Okay. And what did you say to him?
A. That I -- my stomach hurts really bad, --
Q. Okay.
A. -- you know, and --
Q. Did you -- sorry. Go ahead.
A. Sorry. Go ahead.
Q. Did you tell him you thought it was Crohn's?
A. No. I said that my stomach was hurting, and Mo said, oh, is it, you know, Crohn's? Nick told me that you had Crohn's. And he allowed me to leave.

Page 74

Q. Okay. And did you, I guess, respond to that in any way?
A. I said I appreciate it, and I went home.
Q. Okay. How long -- or actually, was there anyone else present for that conversation?
A. Not that I recall.
Q. And do you recall anything else being said?
A. No.
Q. How long did your stomach hurt?
A. When I got there, or...
Q. Yes. And then how long after that?
A. It hurt all day. All -- after I left I couldn't get out of bed.
Q. Okay. And did you think it was Crohn's; because of the Crohn's?
A. Yes.
Q. Okay. And when did it get better?
A. Later that night.
Q. Okay. At that point were you experiencing allergies? Because this was March.
A. Yes.
Q. Okay. What allergies were you experiencing?

Page 75

A. Sneezing.
Q. Did you have a cough?
A. A little cough, yes.
Q. Okay. What about a runny nose?
A. No.
Q. No? Okay. And do you recall whether you were taking allergy medicine at that time?
A. I do not recall.
Q. Okay. And did you come to work on March 29, the day after that?
A. Yes.
Q. Okay. Did you feel sick at all then?
A. Nope. I was -- I was fine. I was healthy.
Q. Okay. Did you still have any allergy symptoms?
A. A sneeze here and there, but nothing to where it affected my work.
Q. Okay. What about a cough; did you still have a little cough?
A. No.
Q. And who did -- do you recall who you worked with on the 29th?
A. Myself.
Q. Was Nick there, do you remember?

Page 76

A. No. I believe -- well, not believe. I know that around that time certain supervisors had to forcefully use their PTO or their time off, so during that week or so Nick was at home working. I forgot what it was called or how it was called, but he wasn't physically there.
Q. Okay. And so what about on March 30, did you go to work then?
A. Yes.
Q. And did you have any -- did you feel sick at all?
A. No, I did not. Just, you know, a little cough and a sneeze. Other than that, I felt -- I felt fine.
Q. And hold on one second. Before --
MS. FREY: Can we just take, I guess, a ten-minute break? Would that work for everyone?
MS. MATCHETT: Yeah, that's fine.
MS. FREY: Okay.
MS. MATCHETT: Come back, you want to say, 11:45?
MS. FREY: Yes.
(Recess taken from 11:34 to 11:46 a.m.)
BY MS. FREY:

Page 77

Q. All right. So before we went on that break we were talking about March 30, and I had asked you if you felt sick the morning when you went in to work, and you were going through how you felt, so can you tell me what -- how you felt sick on 3/30?
A. Queasy.
MS. MATCHETT: Objection. You can answer.
A. Okay. Queasy.
Q. Did you have a runny nose?
A. No.
Q. Okay. And hold on. Let me get the right document here. This is going to mess me up.
Okay. I'm going to show you what I'm going to mark as P-17.
(Exhibit P-17, Plaintiff's Answers to Defendant's First Set of Interrogatories, is marked for identification.)
Q. And this is your interrogatory responses that you produced in this case. Have you ever seen this document before?
A. Yes.
Q. Okay. I'm going to scroll to the end here. Is this your signature at the bottom?

Page 78

A. Yes.
Q. Okay. And do you see where it says, "I hereby certify that the information provided in the foregoing answers to interrogatories is true, to the best of my knowledge, understanding, and belief"?
A. Yes.
Q. Okay. And did you sign this electronically? Is that --
A. Yes, I did.
Q. Okay. And you recall signing it electronically?
A. Yes.
Q. Okay. I just want you to read starting at "On March 30, 2021."
A. Okay.
Q. Can you just read that?
A. Yes.
Q. And you can just read that paragraph and tell me when you're done reading that paragraph.
A. Okay. "On or about March 30" --
Q. Sorry. You don't have to read it out loud.
A. Oh. Sorry.
Q. I'm sorry.
A. Okay.

Page 79

Q. So do you see in that paragraph where it says, "I was having my usual seasonal allergy symptoms, which were scratchy throat, runny nose, and watery eyes"?
A. Yes.
Q. Is that accurate?
A. Yes. A hundred percent.
Q. Okay. So on March 30 when you went in you did actually have a runny nose?
A. Yes. Yes.
Q. All right. I'm going to stop sharing this.
And did you have a scratchy throat as well?
A. Itchy throat, yes.
Q. Itchy throat? And watery eyes too?
A. Yes.
Q. Okay. Did you feel sick in any other way?
A. No. Just, you know, allergy symptoms.
Q. Okay. And you said earlier that you felt nauseous too?
A. Or queasy.
MS. MATCHETT: Objection.
Q. Oh, queasy?

Page 80

A. Yes.
Q. Okay. And what do you -- when you use nauseous and queasy different, why do you differentiate that? Like what's the difference?
A. I don't know. I guess it's the same?
Q. Okay. Is -- okay. That's fine.
How long did you work on March 30?
A. Not even 30 minutes. Or roughly about 30 minutes.
Q. Okay. And who was working with you that day?
A. Nick, the supervisor, and I think one -- one other. I do not recall his name.
Q. Okay. Do you remember if there was anyone else in the area, or was it just you and the other worker and Nick?
A. I think that's about it. I mean, it was probably a few others, but I do not recall their names or where they was at.
Q. Okay. Did you talk to any of them about feeling sick?
A. No.
Q. Okay. Throughout the day was there anything that changed in that 30 minutes?
A. No. I just -- again, I felt a normal

Page 81

allergy symptom.
Q. Was there a point that you decided that you should take a COVID test?
A. Yes. One of the products that I was working on had a distinctive smell, and I couldn't smell that product, and that alarmed me, so that's when I informed my supervisor just in case because again, allergy season, I can't smell anything anyway, so just to be sure, I let him know what was going on, and then he informed me to leave and take a COVID test.
Q. Okay. What was the product?
A. A vanity.
Q. Like a --
A. Like a desk or a -- some kind of furniture thing.
Q. What was the distinctive smell that it had?
A. Like a -- it was really strong, like pneumonia.
Q. Pneumonia or ammonia?
A. I'm sorry. Ammonia.
Q. Ammonia?
A. Yes.
Q. All right. And did you discuss that

Page 82

with anyone other than Nick?
A. Just Nick.
Q. All right. Did you complain to anyone that you were coming into work with COVID symptoms?
A. With COVID symptoms? No. Again, I had allergy symptoms.
Q. Okay. And one of your allergy symptoms was runny nose, right?
A. Correct.
Q. That's also a symptom of COVID, right?
A. Also correct.
Q. Okay. And then cough was also one of your allergy symptoms, right?
A. Yes.
Q. And that's also a symptom of COVID, right?
A. Yes.
Q. Okay. What, exactly, did you tell Nick when you approached him?
A. What I told Nick that I remember is that, hey, man, I -- I can't smell this. I'm concerned. What are the precautions of me, you know, leaving? Am I getting points added onto me? Like what's going on with that? And he informed me just go ahead, take your test, and then once you get

Page 83

the results email me and HR.
Q. Okay. Did they say anything about points or anything like that?
A. No. I mean, with points, I assumed that I had close to five or six points, and then he informed me that I only had three, and that I'm okay, and then to, you know, go home, take the test, and then fill me in with the results.
Q. Okay. Do you remember what time it was when this happened?
A. Approximately between 6 and 7 in the morning.
Q. Okay. Did you tell Nick that you had allergies?
A. I believe I did, yes.
Q. Do you actually recall telling him that?
A. Honestly, no.
Q. Okay. Do you remember what symptoms you told him you did have?
A. It was honestly itchy eyes and the slight cough. That's really it.
Q. So you did tell him you had itchy eyes and the slight cough?
A. Yes.

Page 84

Q. Okay. Do you recall if you were around anyone? Like were you around this other coworker in the morning?
A. At a distance.
Q. Okay. Did you talk to him at all?
A. No.
Q. Did you talk to anyone other than Nick about going to take a COVID test?
A. Just Nick.
Q. Okay. And did you talk to anyone else about allergies?
A. Nope.
Q. Okay. Did you notice any lack of taste at all around that time?
A. The only thing I can say that I remember is I couldn't smell the vanity.
Q. Okay. And do you recall where you went to take the test?
A. At the CVS in Mount Holly.
Q. Okay. And did you have to schedule an appointment for that?
A. I do not recall. I think it was either that day or the next day is when I took the test.
Q. Okay. And do you recall what the

Page 85

results of that test were?
A. Yes. It was a positive. I found out I was positive April 2.
Q. All right. I'm going to show you what I'm going to mark as P-18.
(Exhibit P-18, Copy of a cell phone screenshot of a result of a COVID-19 test taken on 3/30/2021 Bates stamped D-000114, is marked for identification.)
Q. Take a look at that, and tell me when to scroll.
A. You can scroll. Okay. Okay.
Q. Do you recognize that?
A. Yes.
MS. FREY: And sorry. For the record, this is D114.
Q. And what is it?
A. This was the results I received from My Charts through CVS, the app.
Q. Okay. And is it the -- does it have the positive COVID test result?
A. Yes.
Q. Okay. And did you ever tell Wayfair about the positive test result?
A. Yes. I emailed them as soon as I

found out.
Q. Okay. Do you remember who you emailed?
A. I emailed Nick, and I emailed HR. I think her name -- Madison.
Q. Okay. Now, before you actually got the results did you tell HR that you were taking the COVID test?
A. I believe I did. I really don't remember.
Q. Okay. I'm going to share what I'm marking as P-19, and it's Bates labeled D132.
(Exhibit P-19, Email from Dj Gaines to tmCranbury18@Wayfair.com and Nick Segura dated March 30, 2021, Bates stamped D-000132, is marked for identification.)
Q. Can you just read that?
A. Okay.
Q. Do you recall sending that email?
A. Yes.
Q. And is that accurate?
A. Yes.
Q. And then I'm going to mark this P-20, and it's D133.
(Exhibit P-20, Cell phone screenshot of a MC SDS COVID testing appointment on March 30, 2021, Bates stamped D-000133, is marked for identification.)

Q. Can you just read that?
A. Okay.
Q. And do you recognize that?
A. Yes.
Q. Okay. What is it?
A. That's also from My Charts.
Q. Okay. And what is My Charts?
A. Best description of it is it's almost like you go in to visit a doctor without actually physically going to the doctor's. You can make appointments, schedule either appointments, get your medicine, or schedule a call with your doctor without actually going to see them.
Q. Okay.
A. It's another place where you can hold all your information.
Q. Okay. And so was this where you scheduled the COVID test?
A. Yes.
Q. Okay. Is Jenice Caldwell the one who administered it?
A. I believe so, yes.
Q. Okay. And did you take it at 1:00?

A. Yes.
Q. Do you recall saying anything to HR once you got the positive test result back?
A. From my memory, again, I just informed Nick about my results and HR. I think the same -- almost the same exact email explaining to them that, you know, I tested positive and everything, and I'm waiting to see when I can come back to work, and also the amount of time that I have to stay out for having COVID.
Q. Okay. Do you recall apologizing once you got the positive test result?
MS. MATCHETT: Objection. You can answer.
You can answer.
A. I think I have, yes.
Q. Okay. I'm going to mark this P-21. It's Bates labeled D119.
(Exhibit P-21, Email from Dj Gaines to tmCranbury18@Wayfair.com and Nick Segura dated April 2, 2021, Bates stamped D-000119, is marked for identification.)
Q. Can you read this email?
A. Okay.
Q. Do you recall sending that email?

A. Yes.
Q. And why did you say that you hoped they could forgive you?
A. Well, honestly, after, you know, receiving COVID I just didn't want anybody else to be infected by it. You know what I mean. Like I don't -- I didn't want anybody else to go through what I've been through because from my understanding, no one had it prior, you know, so -- and COVID then was -- it still is -- a scare, you know, so...
Q. Did you realize at that point that you probably had it since the 28th?
A. No.
MS. MATCHETT: Objection. You can answer.
You've answered. That's fine.
A. Again, I -- I'm sorry.
Q. Go ahead.
A. Again, I -- I thought it was allergy symptoms. So after I found out that it wasn't the case, then, you know, I felt bad for the team because we didn't have that much team to begin with.
Q. Okay. So initially you had thought it was allergy symptoms, but then once you got the

positive test you realized it was probably COVID symptoms?

A. Correct.

Q. Okay. Do you remember, did anyone respond to this email? Did Nick ever respond to it?

A. Not that I recall.

Q. Okay. Did Nick ever talk to you or did you ever talk to Nick after getting the positive COVID test result?

A. All I could remember is me asking them when I could return to work.

Q. Okay. Do you remember when that was?

A. April 6 or 7 -- or I'm sorry. Between the 5th and the 7th.

Q. Okay. Do you remember what he said?

A. He said that HR would contact me.

Q. Okay. Did he say anything else?

A. That's really it.

Q. Was it a phone call or an email?

A. Email.

Q. Okay. And did you -- I think you said you also remember reaching out to Madison, so I'm going to show you P-22, and it's Bates labeled D130.

(Exhibit P-22, Email exchange between Dj Gaines and Madison Irons dated April 2 and April

4, 2021, Bates stamped D-000130, is marked for identification.)

Q. Can you just read this email?

A. Um-hum. Yes.

Q. Do you remember sending that email?

A. Yes, I do.

Q. Did you ever speak to Madison after sending the email?

A. No.

Q. Okay. Did you try to call her?

A. Not Madison. If I did call, it was probably to HR to speak to somebody about my return date.

Q. Okay. Do you remember ever speaking to somebody?

A. No.

Q. Okay. And just to sum up, so on the 30th you came to work, and you had allergy symptoms, right?

A. Correct.

Q. You then later went and took a test, right?

A. Correct.

Q. And then realized probably your allergy symptoms for the past -- since the 28th had probably

been COVID after you tested positive?

A. On the 30th, yes.

Q. Okay. When you say "on the 30th," what do you mean?

A. Meaning the -- the two days before I felt fine. Or the day before --

Q. Okay.

A. -- I felt extremely fine, you know, and then on the 30th I went to work with, as I recall, a normal allergy symptom, and that's when I left.

Q. All right. And realized later that that had probably, rather than allergies, been COVID?

A. Correct.

Q. Okay.

MS. MATCHETT: Objection. You can answer.

A. Correct.

Q. Do you recall getting terminated from Wayfair?

A. Yes.

Q. Okay. And do you recall why you were terminated?

A. From what I remember, I believe it was

Madison. She said that she looked at cameras and determined that I purposely knew I had it, and that was that, and I just got terminated.

Q. So did you have a conversation with Madison about the termination?

A. I believe so, but --

Q. I mean, --

A. -- she didn't answer me. Like she -- I know I emailed her about something, and then she never responded to me.

Q. Okay. So I don't want you to guess here, so do you recall having a conversation with her, or do you just think you probably did?

A. I think I have, yes.

Q. Okay. But you don't recall for sure that you did?

A. No.

Q. Okay. I'm going to show you what I'm marking as P-23.

(Exhibit P-23, Nine-page document containing an email from Madison Irons to Darryl Gaines dated April 7, 2021, with attachments, Bates stamped D-000143 to 151, is marked for identification.)

Q. Can you just take a look at that and

Page 94

tell me when to scroll?
A. You can scroll. Okay. Okay. Okay. Okay. Okay. Okay. Okay. Okay.
Okay. I do recall this.
Q. Okay.
MS. FREY: And sorry. Just for the record, that's Bates labeled 151.
Q. So do you -- you recall receiving this email?
A. Yes.
Q. Okay. And is --
MS. MATCHETT: I'm sorry, --
Q. -- that --
MS. MATCHETT: -- Rachel. I'm sorry. So it's what to 151?
MS. FREY: Oh, I'm sorry. Oh. Sorry. D143 --
MS. MATCHETT: That's all right.
MS. FREY: -- to 151.
MS. MATCHETT: Gotcha. All right. Thanks.
Q. And was April 7, 2021, was that the date of your separation?
A. Yes.
Q. Okay. And I'm going to show you what

Page 95

I'm going to mark P-24.
(Exhibit P-24, Wayfair Termination Report dated effective 4/7/21 Bates stamped D-000001 and 2, is marked for identification.)
Q. And this is D1 to D2. Can you take a look at that?
A. Yes, I can. Okay. Okay. Okay. Okay.
Q. Do you recall receiving this termination report?
A. Yes.
Q. Okay. Did you ever discuss the termination report with anyone?
A. No.
Q. Is there anything inaccurate on this termination report? If you want me to scroll through the whole thing again, I can.
A. The bottom right there, yeah, the reason, the dates are off.
Q. Okay. And how are the dates off?
A. Like I said before, on the 28th and the 30th besides, you know, my stomach cramping up, the 29th I was fine. And on the 30th I just had the allergy symptom.
Q. Okay. Do you understand that those

Page 96

allergy symptoms: Runny nose, a cough, and a scratchy throat, are also COVID symptoms?
MS. MATCHETT: Objection. You can answer.
A. Yes.
Q. Okay. And you did go to work knowing you had those symptoms?
A. Allergy symptoms, yes.
Q. Okay. All right. Is there anything else on this that you disagree with?
A. That's it.
Q. Okay. I'm marking this P-25, and it's D142.
(Exhibit P-25, Email from Darryl Gaines to Madison Irons dated April 7, 2021, Bates stamped D-000142, is marked for identification.)
Q. Can you take a look at this email?
A. Yes, I can. Okay.
Q. Do you recall sending that email?
A. Yes, I do.
Q. And do you recall why you sent the email?
A. Yes. Just to -- I guess to make it known that, you know, I would never knowingly work with having a COVID symptom. You know, I just

Page 97

honestly wanted to be reinstated. Like I made a practical decision, and that's what I believe that I did, which was a hundred percent correct, and then reach an understanding, you know, why and what to do moving forward.
Q. Okay. When you said in the email -- when it says your allergy symptoms were not going away or got worse, what did you mean by when you say they got worse?
A. Just the itchy eyes, the constantly scratching the eyes. You know, I just don't want, I guess, everybody to think that I had -- you know, I had COVID, which I didn't, you know. I just allergy symptom, you know. So coming in there coughing, especially back then, if you coughed too hard everybody is going to look at you differently, you know, so...
Q. Well, you did have COVID though, right?
A. I had allergies, and then when I went to that test is when I found out I had COVID.
Q. So you did have COVID, right?
MS. MATCHETT: Objection. You can answer.
A. On the 30th I had allergies, and when that same day I went to get tested, that's when I

found out on April the 2nd I had COVID.
Q. And so in hindsight did you realize those allergy symptoms were actually COVID?
MS. MATCHETT: Objection. You can answer.
A. I couldn't tell.
Q. Okay.
A. I just thought I had allergies, and then when I went to take the test, come to find out it was COVID.
Q. Okay. Did Madison ever respond to this email?
A. No.
Q. Did you ever try and call her?
A. No.
Q. Did you try and talk to anyone else?
A. No. I couldn't after that.
Q. Why do you say you couldn't?
A. As soon as I got separated from the company, my work emails did not work.
Q. Okay. So you didn't have any contact information saved?
A. No. So I just had to -- I couldn't get no one's contact information.
Q. Okay. So I guess did Nick ever make

any comments about you having COVID? Like did he ever say --
MS. MATCHETT: Objection to form.
Q. -- anything about it?
A. No.
MS. MATCHETT: Same objection. You could answer.
A. No, he did not.
Q. Okay. Do you remember Madison Irons ever making any comments about you having COVID?
A. No.
MS. MATCHETT: Objection. You could answer.
Q. Okay. Was this the only time you've ever had COVID?
A. Yes.
Q. Okay. Sorry. I guess that you know of.
Did you receive any treatment after you got COVID?
A. There really isn't treatment for COVID, especially back then. All I could tell you that CDC called me and told me just to stay inside and quarantine myself. They had --
Q. Okay.

A. -- no answers.
Q. When did the CDC call you?
A. Approximately April 2, when I found out I had COVID.
Q. Okay. Had you reported it to the CDC? Do you know why they called?
A. Not that I recall. All I know is that they did call me and to instruct me on what to do.
Q. Okay. And did you -- like how did you feel when you had COVID?
MS. MATCHETT: Objection. You could answer.
A. Okay. Besides bad, you know, it's hard to explain because it's -- it affects everybody differently, you know, so I felt fine. I didn't have a fever. I just couldn't go outside for about two weeks. Other than that, that was really it.
Q. Okay. And not being able to go outside, was that because of the quarantine or because you were so sick you couldn't go outside?
A. Because of the quarantine.
Q. Okay. So if you hadn't been quarantined would you have just gone about life like normal?
MS. MATCHETT: Objection. You could

answer.
A. Can you repeat the question one more time, please?
Q. So if you hadn't been quarantined -- I guess what I'm asking is were you sick enough where you were like bedridden, or were you just going about like normal?
MS. MATCHETT: Objection. You could answer.
A. Okay. Well, I felt fine. There's been times when, you know, my stomach would hurt, but other than that, I was in bed playing video games most of the time and just recovering.
Q. Okay. And how long did your symptoms last?
A. Very long time.
MS. MATCHETT: Objection. You can answer.
Q. Can you give me an approximation of what a "very long time" is?
A. Okay. Well, the fever and everything else has gone. Currently I no longer have a taste or smell.
Q. So you still don't have taste or smell now?

Page 102

A. Yes.
Q. Okay. And wait. So did you have a fever or not?
A. No.
Q. No fever. Okay. How long did the runny nose last?
A. Not that long.
Q. And what about the -- sorry. Go ahead.
A. The runny nose did not last long. The coughing, that stopped, but all I can say honestly is that my sense of taste and smell was completely gone.
Q. Okay. Has it come back at all since then?
A. No.
Q. Did you ever tell Nick about how you felt when you had COVID?
A. No, 'cause after I got separated from the company there was no more communication within the job itself, including Nick or anybody.
Q. So does the same go for Madison too; you didn't talk to her about how sick you felt?
A. Yes.
Q. Yes, you did talk to her or --
A. No. I'm sorry. I'm sorry. Yes, I

Page 103

did not talk to her.
Q. Okay. Sorry. That was how I asked the question.
Was there anyone else that you -- at Wayfair that you talked to about how you felt while you had COVID?
A. No.
Q. Okay. Did Madison ever make any comments about how sick she thought you would get or like having COVID itself to you?
A. No. Madison did not talk to me really at all.
Q. Okay. Was there anyone else from HR -- in Wayfair they call it talent management. But was there anyone else from talent management that talked to you about your symptoms?
A. No. No one contacted me.
Q. Okay. And you never went to -- you were never hospitalized or anything like that for COVID?
A. No. No.
Q. Okay. So in this lawsuit you're claiming that you were discriminated against based on a disability. Can you tell me what that disability is?

Page 104

MS. MATCHETT: Objection. You can answer.
A. I believe COVID was a disability.
Q. Okay. Anything else?
A. That's all I can recall.
Q. Okay. And you also have a perceived disability claim. Was that also COVID?
A. I believe so, yes.
Q. Okay. Anything else?
A. That's all I could recall.
Q. Okay. And who do you allege discriminated against you because you got COVID?
MS. MATCHETT: Objection. You can answer.
A. HR. Okay. HR.
Q. Who in HR?
MS. MATCHETT: Objection. You can answer.
A. Okay. My opinion, just HR in general, or I guess I -- I guess how I got separated. I'm trying to answer the question.
Q. Well, you allege HR discriminated against you because you got COVID. Is it just HR as a whole?
A. I guess the combination --

Page 105

MS. MATCHETT: Objection. Hold on. Hold on. I'll just have you stop for a second.
I think that's a mischaracterization of the testimony. I'm going to allow him to answer, but I don't think that aligns with the earlier questioning.
MS. FREY: Okay. That's fine.
Q. So what evidence -- I guess what is your evidence of any discrimination?
MS. MATCHETT: Objection. You can answer.
A. Okay. Best of my knowledge, the fact that I got terminated with COVID without, in my opinion, proper explanations or, you know, ways about handling the situation.
Q. And what do you mean by "ways about handling the situation"?
A. The fact that no one was contacting me of what to do, I felt like they left me high and dry. That was in the means of at least getting some information back on when to return to work. I know people who had COVID came back to work fine, and I was just wondering like, all right, I've quarantined myself, so when is my -- my return date? And I didn't receive any information, you know, about me

Page 106

coming back to work.
Q. Okay. And who else did you know that had COVID and returned to work fine?
A. People from different departments. I don't know specifics.
Q. No names?
A. No. No names.
Q. Okay. Do you know who they were supervised by?
A. No, I did not.
Q. Okay. And do you know whether they came to work experiencing COVID symptoms?
A. No, I do not.
Q. Okay. Is that just you don't know?
A. Yeah. I just -- I don't know. The only thing --
Q. Okay.
A. -- I do know is that during standup Nick will read us who had it or what department, you know, had a case, and, you know, if they returned to work or not.
Q. Okay. So I guess -- so you understand that Wayfair's policy is to terminate someone if they come to work with COVID. Is that fair?
A. I --

Page 107

MS. MATCHETT: Objection. You can answer.
A. From what I read, yes.
Q. Okay. And when you say from what you read, did you know that before you read that today?
A. Yes. Yes.
Q. Okay. Do you have any reason to believe that you weren't terminated because Wayfair believed you came to work with COVID symptoms?
A. Well, again, I --
MS. MATCHETT: Objection. You can answer.
A. Okay. When I went to work it -- I felt fine. It was allergy related symptoms. And then, you know, when I did find out after I left work that I got COVID, I got fired. You know, I guess I didn't understand why. You know, I didn't work on the schedule. I wasn't scheduled to work. I followed that directions policy, which was to quarantine for two weeks, and then after I tested negative, after the quarantine is over, then I should be able to return back to work, but I didn't get that far to, you know, test negative to come back to work. They -- days later they just terminated me.

Page 108

Q. Well, do you understand that even if you don't have a positive test, if you have COVID symptoms that you're subject to termination?
A. Not that I recall then.
Q. So you thought it was fine to go to work with COVID?
A. Again, I did not go -- personally go --
MS. MATCHETT: Objection. You can answer.
A. -- to work with --
Q. Well, that's not my question.
A. Okay.
Q. My question is just do you understand that if you had COVID symptoms you weren't supposed to go to work? Is that something you understood?
A. Yes.
MS. MATCHETT: Objection. You can answer.
Q. Okay. Did you -- so I guess -- so my question is what evidence do you have that Wayfair didn't just terminate you because you came to work with a scratchy throat, which is a COVID symptom; a runny nose, which is a COVID symptom; and a cough, which is a COVID symptom? Do you have any evidence

Page 109

that they terminated you for any other reason?
A. No.
MS. MATCHETT: Objection. You could answer.
A. No.
Q. Okay. And I guess aside from HR, is there -- are you alleging that Nick discriminated against you based on your -- based on COVID?
MS. MATCHETT: Objection. You could answer.
A. No.
Q. Okay. Did you ever request time off because of COVID?
MS. MATCHETT: Objection. You can answer.
A. I believe it was called the EPTO, I believe, but all I could recall is that that time frame I only worked three days, and I was off for the remaining days anyway.
Q. Okay. So do you claim that Wayfair terminated you because you requested time off?
A. No.
Q. Okay. So I know you've said you knew there were other people who tested positive for COVID and then came back to work. Do you know of

Page 110

anyone else who was terminated --
A. No.
Q. -- after testing positive for COVID?
Okay. No?
How many people do you know that tested positive for COVID?
A. I do not know the numbers.
Q. Don't know the numbers. Okay.
Did anyone else on your team ever test positive for COVID?
A. No.
Q. And do you know whether anyone else supervised by Nick tested positive for COVID?
A. No.
MS. MATCHETT: Objection. You can answer.
Q. And I think you said that Nick would like list off like names of people who -- or like people who tested positive. Was that like at the startup meeting? How did that happen?
A. It wasn't names, it was department. Like he would say like department -- I don't know. At docking there was a case. That's really it, you know.
Q. Okay. And that would just be the

Page 111

startup meeting?
A. Right.
Q. Okay. Was there like -- did you guys have like social distancing or anything like that?
A. We were supposed to.
Q. Okay. And when you say it was supposed to, what do you mean?
A. Okay. So again, back then six feet, but because our department was so small, there's only five of us or a handful of us, we -- sometimes we'd work together, especially for items that's too heavy to carry, just to get a second opinion on what this looks like. We were always together. So in our department we was never six feet, but we did wear our masks.
Q. Okay. Did you ever complain to anyone that there wasn't social distancing?
A. No.
Q. Do you know if anyone else did?
A. No.
Q. Were you ever -- like did you ever wear bracelets or anything like wristbands for like to help with social distancing?
A. Yes. That happened not throughout the whole time I worked there. That happened towards

Page 112

the end of me working there.
Q. Okay. Can you just describe that?
A. Yes. It's a -- it's a little -- a bracelet that people would wear. Like if you're too close, it will go off --
Q. Okay.
A. -- and let people know, hey, back up six feet.
Q. Was that effective at all?
A. No.
Q. Really?
A. It was not, no.
Q. Do you remember like what time period it was?
A. When we received the bracelets?
Q. Yes.
A. No, I do not.
Q. All right. I actually -- actually, let me go through one more thing, and I think it would make sense to take a break after I go through this one more thing.
All right. I'm sharing again the interrogatories. I cannot recall what I marked them though.
MS. MATCHETT: The rogs? 17.

Page 113

MS. FREY: 17? Okay.
Q. So I'm showing you P-17 again, which that was your answers to interrogatories. I just want to ask you about one part. Can you just read this bullet pointed list?
MS. MATCHETT: And this is in the answer No. 11?
MS. FREY: Right. Answer No. 11 on page 7. Yes.
A. Okay.
Q. So can you just tell me who Mo is?
A. Yes. Mo was the area supervisor who I talked to on March 28 about me having upset stomach.
Q. Okay. Is that the only knowledge that he has about this case?
A. Yes.
Q. At least that you're aware of.
And who is Nick? Is that Nick Segura?
A. Yes.
Q. Okay. And was he your supervisor?
A. Yes.
Q. And other than the interactions that you have described earlier, is there any other like knowledge that he has about this case that you're aware of?

Page 122

Q. Okay. And why do you believe that?
A. The fact that how -- how it was during me working at Wayfair. Personally the -- the rules wasn't really enforced. Everyone was working close-knit. It was kind of impossible to do your job without being close with somebody.
Again, these items is not light. They're extremely heavy. We, again, have no choice but to have a buddy system, especially when you're just dealing with these heavy, heavy items.
Q. And around when you got COVID did anyone you were working closely with have COVID symptoms that you recall?
A. Not that I know of.
MS. MATCHETT: Objection. You can answer.
You can answer.
Q. And did anyone else test positive for COVID?
A. In my department?
MS. MATCHETT: Objection. You can answer.
Q. Right. Yes. That you worked around.
A. No. Not that I know of.
Q. So are you saying that you caught COVID

Page 123

from someone who didn't have COVID?
A. No, what I'm saying is that I could possibly -- I could possibly get COVID from just interacting with people in general at -- at working there.
Q. Well, I mean --
MS. MATCHETT: Also object to -- I object to the form of the question. He started to answer, so I wanted to wait until he was done.
MS. FREY: That's okay.
Q. So do you think you can catch COVID from someone who doesn't have COVID?
A. No.
MS. MATCHETT: Objection. You could answer.
Q. Okay. And you didn't know of anyone that you were working closely with that had COVID, right?
A. Correct.
Q. Okay. Is there any other reason that you think you might have caught COVID at Wayfair aside from just working close to people?
A. Using the restroom, going to common area to eat and, you know, smoke a cigarette.
Q. Do you have any actual evidence that

Page 124

you caught COVID from like going to those places?
MS. MATCHETT: Objection. You can answer.
A. No.
Q. Okay. And did you interact with people outside of Wayfair like in your everyday life?
A. No.
Q. What about your roommate; did you interact with her?
A. No. Our -- our schedules did not match up --
Q. Okay.
A. -- at all. Yes.
Q. Did you have any friends outside work?
A. Yes, I did, but after work I just go straight home.
Q. What about on your days off?
A. Stay home.
MS. MATCHETT: Objection. You can answer.
Q. Okay. So you never hung out with your friends?
A. No. Especially at that time. A couple of years back there was really no hanging out.

Page 125

Q. Okay. And were you working as a lot attendant at that time?
A. Yes. During the weekend.
Q. Okay.
A. When I'm not at Wayfair.
Q. Okay. And did you interact with people as a lot attendant?
A. Yes.
Q. Okay. And was that at the end of March were you still doing lot attendant stuff?
A. No. Not that week, no.
Q. Not that week? What about the week before?
A. Week prior, yes.
Q. Okay. And did you take time off from the lot attendant, your job as a lot attendant when you got COVID?
A. Yes. I informed my boss there that I got COVID, and I took the two weeks to quarantine.
Q. Okay. Were you ever worried that they would fire you for getting COVID?
A. No.
Q. So aside from the lost wages, are there any other economic damages that you're alleging?
A. Not that I can recall, no.

MS. MATCHETT: Objection. You can answer.

Q. Okay. So as -- how long after you were -- so you were terminated from Wayfair, and you were still working as a lot attendant. Were you able to increase your hours there at that time?

A. Unfortunately, no.

Q. Okay. Was there a point down the road that you were able to increase your hours?

A. Yes.

Q. When was that?

A. I do not recall when exactly, but I was informed by the GM that I could go from another location to increase the hours.

Q. Okay. Do you recall like what month that was?

A. Oh, jeez. Excuse me. I could only honestly recall that it was hot, so around June. June, July.

Q. Okay. Would there be any like paperwork reflecting that change?

A. From the car dealership? No. I don't think there was a paperwork exchange. It was more of a phone call, like, hey, I'm sending someone over to, you know, continue working.

Q. Okay. Did you get -- did you receive pay stubs for that job?

A. Yes.

Q. Do you know if those pay stubs have been produced?

A. Yes.

Q. Okay.

MS. FREY: And I'd just -- I would, and I'll send you a letter about this later, Jacquelyn, but if they have not, I would just request those pay stubs.

Q. All right. And would those pay stubs, I guess, reflect when your hours increased?

A. Yes.

Q. Okay. And what did those hours increase to?

A. I believe 40 hours.

Q. Okay. Who was your supervisor at the company?

A. At the car dealership?

Q. Yeah.

A. Well, the general manager, I had him, and then my department manager. That's at one location, and then I had -- I was directly under the owner of the company and another manager for that

department.

Q. Okay. And what was the owner's name?

A. Okay. The owner's name is Colin. The manager at -- for the department, his name was Mike. Those two names I mentioned there, they work at Lucas Ford. And prior from this I worked at Lucas Chevy, so his name -- the GM's name was Ryan, and the manager's name was Bill.

Q. Okay. Got it. And how much -- I think you might have said this earlier. I think you said you made 12.50 an hour --

A. Yes.

Q. -- at the dealership?

Okay. And at some point it went up 50 cents, if I recall correctly. Is that right?

A. Yes. Approximately, yes, correct.

Q. Okay. Would it have gone up when you went from the 20 hours or the part-time to the full 40 hours a week?

A. I'm sorry. Can you repeat that one more time?

Q. Sorry. I'm trying to figure out when did it go up the 50 cents?

A. Well, it went up as soon as I went from Lucas Chevy to Ford.

Q. Got it. Okay.

A. As a thank you for, you know, doing this.

Q. Okay. And do you still work as a lot attendant?

A. No, I do not.

Q. Okay. When did you stop?

A. I believe -- sorry. All I could remember was two holidays. I think either Thanksgiving or Christmastime, so I believe it was around Christmastime.

Q. Do you know what year that was?

A. Entering -- so I think 2021 into '22.

Q. Okay. And why did you stop?

A. The location was further than where I lived at in Medford, and the amount of work that I -- I did for Lucas Ford was way too much for a lot attendant to do. Asking for an increase, I didn't get their -- you know, the right answer, I guess, so I decided to hop out, and I've been there for years, so it was a mutual understanding.

Q. Okay. What were they asking you to do that was way beyond what a lot attendant did?

A. Go to Costco and get snacks for the vending machine, check the mail. You know, just

# EXHIBIT B

**Standard Documents**

| Document | Effective Date | Document Link | Document Attachment | Signature Type | Signed By | Signature Date | Signature Statement | Uploaded Document |
|---|---|---|---|---|---|---|---|---|
| PayActiv Acknowledgement | 6/11/2020 | | PayActiv Acknowledgment.pdf | Acknowledgment | Dj Gaines (Terminated) REDACTED | 11/9/2020 10:33 | I acknowledge that I have read and understand the PayActiv Acknowledgement. | |
| Wayfair Employee Guide Link | 12/20/2019 | Wayfair Employee Guide Link | | Acknowledgment | Dj Gaines (Terminated) REDACTED | 11/9/2020 10:33 | By checking the box below, I acknowledge receipt of the Wayfair Employee Guide and any applicable addenda. I have reviewed and understand the policies and guidelines set forth in the Employee Guide and addenda, and acknowledge that I have read and understand the included information concerning the "Purpose and Legal Effect" of this Employee Guide and addenda. | |
| Wayfair Non-Solicitation, Non-Disclosure & Inventions Agreement Non-CA L0-L4_DocuSign | 3/16/2020 | | Wayfair Non-Solicitation, Non-Disclosure & Inventions Agreement Non-CA L0-L4.docx | E-sign by DocuSign | Dj Gaines (Terminated) REDACTED | 11/9/2020 10:35 | | Wayfair Non-Solicitation, Non-Disclosure & Inventions Agreement Non-CA L0-L4_DocuSign_uploaded |
| Wayfair Harassment Policy | 1/1/1900 | | Wayfair Harassment Policy 2017-11-22.pdf | Acknowledgment | Dj Gaines (Terminated) REDACTED | 11/9/2020 10:35 | By checking the box below, I acknowledge receipt of a copy of the Company's Statement Prohibiting Harassment of Employees. | |
| Biometric Data Policy & Consent Form (Non-IL) | 12/9/2020 | | All States (Minus Illinois) - Biometric Data Policy & Release Form - v3.pdf | Acknowledgment | Dj Gaines (Terminated) REDACTED | 12/28/2020 14:25 | I have been given, have read, and understand Wayfair's Biometric Data Policy (the "Policy").<br><br>I understand that in the course of my employment with Wayfair I may be using "biometric technology," including but not limited to timekeeping terminals, biometric authenticators on company-issued devices, temperature verification systems, and/or wearable devices. I understand that by using these devices my Biometric Data may be collected, stored, and used in accordance with the Policy, for the purpose of associate identification and timekeeping, secure authentication, and protecting the health and safety of others.<br><br>I understand the limitations placed on Wayfair by the Policy with regards to the collection, use, storage, possession, transmission, disclosure, redisclosure, transfer, retention, and destruction of my Biometric Data. I further understand that Wayfair reserves the right implement other biometric technology in additional to those described above. These future systems may also collect, use store, possess, transmit, disclose, redisclose, transfer, and/or retain my Biometric Data and I consent to any future biometric technology Wayfair may use.<br><br>I understand that my consent to the uses of my Biometric Data set forth in this policy is a condition of my employment at Wayfair. I have read this policy, I understand it, and I voluntarily consent to Wayfair and its vendors, affiliates, subcontractors, and licensors, collecting, capturing, storing, having access to, using, obtaining, possessing, and/or disclosing my Biometric Data as set forth in this Policy, by clicking the button below. | |
| New Jersey Gender Equity Poster | 1/8/2021 | | New Jersey Gender Equity Poster.pdf | Acknowledgment | Dj Gaines (Terminated) REDACTED | 1/27/2021 7:42 | By checking the box below, I acknowledge receipt of a copy of the New Jersey Gender Equity Poster, and that I have read it and I understand it. | |

CONFIDENTIAL

# EXHIBIT C

# Symptom Awareness and Symptomatic Policy

Any employee that is experiencing symptoms of the COVID-19 virus **may not report to work, and must contact Talent Management immediately.**

**Common symptoms included, but are not limited to:**

- Fever or Chills;
- Cough;
- Shortness of breath or difficulty breathing;
- Fatigue;
- Muscle or body aches;
- Headache;
- New loss of taste or smell;
- Sore throat;
- Congestion or runny nose;
- Nausea or vomiting;
- Diarrhea

CONFIDENTIAL

# COVID-19: Call-In Hotline for Before Your On-Site Start Date

If you answer "yes" to either of the following questions, you are **REQUIRED** to reach out to **1-844-322-6799** as part of our ongoing support of the wellbeing of all employees:

- **Over the last 14 days, have you tested positive for infection with COVID-19 and/or were you symptomatic of COVID-19** (fever, dry cough, shortness of breath, chills, muscle pain, sore throat, and/or new loss of taste / smell)?
- **Over the last 14 days, have you been in close contact (within 6 feet) or spent an extended period of time in the presence of a person who tested positive for infection with COVID-19 and/or who was symptomatic of COVID-19** (fever, dry cough, shortness of breath, chills, muscle pain, sore throat, and/or new loss of taste / smell) over the prior 14 days?

Your job will not be subject to termination!

**Follow these steps:**

- Call **1-844-322-6799** and leave a voicemail
  - First and last name
  - Orientation Date
- Someone from our Talent team will reach out to reschedule Orientation with you

- *Please note: After leaving the voicemail* ***you may not attend on-site training or shifts until you speak with Talent***

CONFIDENTIAL



# COVID-19 Test Policy During Employment

**Any employees that take a COVID-19 test must contact Talent Management as soon as possible and stay home:**

If you have taken a COVID-19 test within the last 14 days for **any reason**, **you are not permitted to report to your location**.

Contact Talent Management immediately upon scheduling or taking the test for further instruction.

**This includes:**

- Employees that are asymptomatic
- Employees with no known exposure to someone who is positive
- Employees taking it because of travel or attending a public event or private gathering

Violation of this policy will result in corrective action, up to and including termination of your employment.

CONFIDENTIAL

# EXHIBIT D

# Keep Well This Winter.

Covid-19 is still a threat to our health. It is essential that all employees do their part to stay safe and keep their families, colleagues and communities safe.

Remember to:

- Wear masks while in and near Wayfair buildings at all times. We also highly recommend wearing masks outside of work
- Maintain adequate social distancing of six (6) feet or more at all times (including during lunch)
- Frequently wash hands and use hand sanitizer
- Do not come to work if you are sick. If you are pending a test result, do not come to work until the test is confirmed negative.

# EXHIBIT E

# Keep Well This Winter.

Covid-19 is still a threat to our health. It is essential that all employees do their part to stay safe and keep their families, colleagues and communities safe.

Remember to:

- Wear masks while in and near Wayfair buildings at all times. We also highly recommend wearing masks outside of work
- Maintain adequate social distancing of six (6) feet or more at all times (including during lunch)
- Frequently wash hands and use hand sanitizer
- Do not come to work if you are sick. If you are pending a test result, do not come to work until the test is confirmed negative

**SCAN THE QR CODE FOR MORE TIPS ON STAYING SAFE!**

# EXHIBIT F

# STOP!

## DO NOT ENTER THE BUILDING IF YOU ANSWER YES TO ANY OF THE FOLLOWING QUESTIONS:

**Are you, or someone you live with, currently waiting for a Diagnostic/Reasonable Suspicion COVID-19 test result?****(This is a test performed due to symptoms or potential recent exposure to a known positive case).*

**Over the last 14 days, are/were you symptomatic of COVID-19** *(examples: fever, dry cough, shortness of breath, chills, muscle pain, sore throat, and/or new loss of taste/smell)*

**Over the last 14 days, have you tested positive for COVID-19?**

**Over the last 14 days, have you been in close contact (within 6 feet) or spent an extended period of time in the presence of a person who tested positive for infection with COVID-19, is pending a Diagnostic/Reasonable Suspicion test result and/or who was symptomatic of COVID-19 over the prior 14 days?**

**IF YOU ANSWER YES TO ANY OF THESE QUESTIONS:**

- Do not enter the building
- Employees are required to leave the site and contact your Supervisor, your Operations Manager, or Talent Management.
- Employees may also reach out to your site call out line
- If Talent Management is currently not on-site, employees should **enter a Talent Ticket through Wayfair Assist by scanning the QR code to the right.**

***VISITING THE BUILDING?***

*If you answered **YES**—do not enter the building. Contact your Wayfair Point of Contact.*

**IF YOU ANSWERED NO TO ALL OF THE ABOVE QUESTIONS, BEFORE ENTERING THE BUILDING, REMEMBER TO:**

- Wear a mask while in & near a Wayfair building at all times
- Maintain adequate social distancing at all times (6 feet or more)
- Wash & sanitize hands frequently

WE ALL MUST CONTINUE TO DO OUR PART TO KEEP OURSELVES, LOVED ONES, COMMUNITIES, CUSTOMERS & COLLEAGUES SAFE

**LEARN MORE, TAKE A FLYER | APRENDE MAS, TOME UN VOLANTE | APRANN PLIS, PRAN YON BWOCHI**

# EXHIBIT G



---------- Forwarded message ---------
From: **Dj Gaines** <dgaines1@wayfair.com>
Date: Fri, Apr 2, 2021 at 4:35 AM
Subject: Re: COVID-19 results
To: tmcranbury18@wayfair.com <tmcranbury18@wayfair.com>, Nick Segura <nsegura@wayfair.com>

On Friday, April 2, 2021, Dj Gaines <dgaines1@wayfair.com> wrote:

> Unfortunately I have covid I'm so sorry for my boss nick and my team, I hope you can forgive me

--
Madison Irons
Senior Associate - Talent Management
Wayfair, LLC
18 Hightstown Cranbury Station Rd
Cranbury, NJ 08512
Email: mirons@wayfair.com

Cranbury, NJ 1, 2, & 3

**CLICK HERE TO OPEN A TALENT TICKET**

# EXHIBIT H



# Termination Report

INSTRUCTIONS

Use this form to document all involuntary terminations – include all supporting documentation. Complete all sections. Before terminating an employee, Manager must review the decision with their Senior Manager and Talent Management prior to termination.

| | |
|---|---|
| EMPLOYEE NAME | EMPLOYEE NAME<br>Dj Gaines |
| TERMINATION DATE | EFFECTIVE DATE<br>4/7/21 |
| TERMINATION REASON | ENTER APPROPRIATE TERMINATION CODE REFLECTING REASON FOR TERMINATION (CODES CAN BE FOUND IN WORKDAY WHEN YOU PROCESS THE TERMINATION)<br>Violation of Company Policy- Covid Policy |
| LAST DAY WORKED | LAST DAY THE EMPLOYEE PHYSICALLY WORKED<br>3/30/21 |
| LAST PERFORMANCE EVALUATION RESULTS | ENTER THE MOST RECENT PERFORMANCE EVALUATION RESULTS RATING GIVEN TO THE EMPLOYEE<br>Click here to enter text. |
| HIRE DATE | ORIGINAL HIRE DATE. (OR MOST RECENT REHIRE DATE IF APPLICABLE)<br>11/9/20 |
| DEPARTMENT | ENTER THE EMPLOYEE'S CURRENT DEPARTMENT<br>QC |
| LOCATION | ENTER THE EMPLOYEE'S CURRENT LOCATION<br>Cranbury 18 |
| JOB TITLE | ENTER THE EMPLOYEE'S CURRENT JOB TITLE<br>Warehouse Associate |
| SUPERVISOR/MANAGER | ENTER THE EMPLOYEE'S CURRENT SUPERVISOR/MANAGER<br>Nick Segura |
| PERSON(s) CONDUCTING TERMINATION MEETING | ENTER NAME OF PERSON CONDUCTING TERMINATION CONVERSATION WITH EMPLOYEE<br>Madison Irons |
| WITNESSES PRESENT | ENTER NAME(s) OF PERSON(s) WITNESSING TERMINATION CONVERSATION WITH EMPLOYEE<br>N/A |

COACHING/ DISCIPLINARY ACTION SUMMARY

LIST ANY COUNSELING OR CORRECTIVE ACTION DOCUMENTS ISSUED TO THE EMPLOYEE AND DATES ISSUED . Forward documents to Talent Management.

| ACTION TAKEN | DATE |
|---|---|
| • Click here to enter text. | MM/DD/YYYY . |
| • Click here to enter text. | MM/DD/YYYY . |
| • Click here to enter text. | MM/DD/YYYY . |

| | • Click here to enter text. | MM/DD/YYYY . |
|---|---|---|

| | |
|---|---|
| DESCRIBE THE FINAL INCIDENT LEADING TO TERMINATION AND THE REASON FOR TERMINATION.<br><br>BE CONCISE AND SPECIFIC.<br><br>REFERENCE POLICY/ PROCEDURE VIOLATION(S).<br><br>INCLUDE ANY PERTINENT NOTES OR COMMENTS. | **DJ started experiencing symptoms of Covid-19 on 3/28 but came to work on 3/28, 3/29 and 3/30, disregarding Wayfair's policy of not coming on site when you are sick or experiencing any symptoms.** |

SUPERVISOR/MANAGER:_________________________________________ DATE: ____________________________

SENIOR MANAGER/DIRECTOR:______________________________________ DATE: ____________________________

TALENT MANAGEMENT:______Madison Irons___________________ DATE: ___4/7/21_________

EMPLOYEE:_____________________________________________________ DATE: ____________________________

# EXHIBIT I

**Warehouse Associate**

We are Wayfair; we deliver a best-in-class customer experience in the furniture and home space because of people like you, who are driven, determined, collaborative, and thrive in a fast-paced environment. In order to maintain our high level of delivery standards and meet our customer's needs, the Wayfair Dedicated Operations team plays a key role in improving customer satisfaction and driving repeat business. We've been busy building a best-in-class logistics network that allows us to delight customers by speeding up deliveries, adding services, and reducing damage using our own physical, asset-based warehouses. We are looking for talented hard-working individuals to join our growing team – your professional home awaits you at Wayfair!

**What You'll Do**

- Unload and receive inbound furniture orders which will require manually moving large, heavy goods.
- Use scan technology to document pertinent carton level information, including condition, quantity, and warehouse location of material.
- Proactively monitor order management systems to ensure that all orders have been received properly and that detailed descriptions are provided for any Overage/Shortage/Damage issues.
- Perform regular cycle counts to ensure inventory is accurate and up to date.
- Pick deliveries from inventory and stage them by truck and stop number.
- Provide direct input into the existing user tools and make recommendations for improvements based on your everyday experience.
- Be a vocal contributor on the team.
- Work effectively with peers and managers.
- Identify the most efficient way to complete assigned tasks and asks clarifying questions when appropriate.
- Perform additional responsibilities as assigned.

**What You'll Need**

- Must be comfortable repeatedly lifting up to 75 pounds unassisted and maneuvering product 150+ pounds unassisted or via team lift.
- Must be able to work on warehouse floor 8 hours a day or more.
- Strong, consistent work ethic.
- Comfort with scanning technology.
- Experience in Distribution or Logistics is a plus.
- Experience working in High Jump is a plus.
- Able to read and comprehend English to ensure your safety and the safety of those working around you.

# EXHIBIT J



# SARS-COV-2 RNA, QL, RT PCR (COVID-19)

Results
**Abnormal**

Status: **Final result (Collected: 3/30/2021 1:02 PM)**

Hello,

You have a **POSITIVE** Covid-19 Test Result.

If you have a positive test result, it is very likely that you
Therefore, it is also likely that you may be placed in isola
spreading the virus to others. There is a very small chan
can give a positive result that is wrong (a false positive r
people who test positive for COVID-19 may be eligible tc
monoclonal antibody treatment. Patients who have a PC
their provider to screen for and order this treatment if ind
without a PCP can go to an urgent care center or ER for
more information regarding this treatment and to see if it
something you could qualify for, see this Patient Fact Sh

| Component | Value | Flag | Ref Range | Units | Status |
|---|---|---|---|---|---|
| **SARS-CoV-2 RNA (COVID-19), QUALITATIVE NAAT** | DETECTED | ! | NOT DETECTED | | Final |

Comment:

```
A Detected result is considered a positive test
result
for COVID-19.  This indicates that RNA from SARS
CoV-2
(formerly 2019-nCoV) was detected, and the
patient is
infected with the virus and presumed to be
contagious.
If requested by public health authority, specime
will
be sent for additional testing
```